1

2

3

4

5



6

7

8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11 | S.S., a minor, by and through his Guardian )   Case No.: 3:21-cv-01367-BEN-DEB
ad Litem Eunjin Stern; EUNJIN STERN,   )

12 | an individual; WILLIAM STERN, an   )   **ORDER:**
individual,,   )

13 |   )
                                      )   **(1) GRANTING-IN-PART AND**

14 |          Plaintiff,   )        **DENYING-IN-PART**
                                      )        **DEFENDANT'S MOTION TO**

15 | v.   )        **COMPEL ARBITRATION;**
                                      )

16 | PELOTON INTERACTIVE, INC., a   )   **(2) OVERRULING PLAINTIFFS'**
Delaware corporation; DOES 1 through   )        **EVIDENTIARY OBJECTIONS;**

17 | 50, inclusive,   )
                                      )   **(3) DENYING DEFENDANT'S**

18 |          Defendant.   )        **MOTION TO DISMISS; and**

19 |   )

20 |        **(4) GRANTING DEFENDANT'S**
             **MOTION TO STAY AS TO**

21 |             **WILLIAM STERN ONLY.**

22 |        **[ECF Nos. 11, 12, 13, and 14]**

23 ## I.      INTRODUCTION

24      Plaintiff S.S., a minor, by and through his Guardian ad Litem Eunjin Stern

25 ("S.S."); Eunjin Stern, an individual ("Mrs. Stern"); and William Stern, an individual

26 ("Mr. Stern") (collectively, "Plaintiffs") bring this action against Defendant Peloton

27 Interactive, Inc., a Delaware corporation ("Defendant" or "Peloton") for injuries

28 allegedly sustained in connection with Peloton's Tread+ treadmill (the "Tread+").

Before the Court is Defendant's Motion to Compel Arbitration and to Dismiss or Stay the Case (the "Motion"). ECF No. 11. The Motion was submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure. ECF No. 14. After considering the papers submitted, supporting documentation, and applicable law, the Court **DENIES** Peloton's Motion to Compel Arbitration as to Mrs. Stern and S.S. but **GRANTS** the Motion as to William Stern only.

## II.   BACKGROUND

### A.   Statement of Facts

Peloton is an innovative fitness equipment and media company that combines technology, hardware, and production to bring the immersive experience of fitness class into the home. Motion, ECF No. 11-1 ("Mot.") at 6:26-28 (citing Declaration of Daniel Feinberg, ECF No. 11-2 ("Feinberg Decl.") at ¶ 3). It sells stationary bicycles and treadmills that allow subscribers to remotely participate in classes via streaming media. *Id.* at 7:1-2. For streaming media, Peloton's Terms of Service state that it "**provides an online fitness community** and related products, services, content and features **through . . . the interfaces on tablets** <u>connected to</u> **Peloton fitness equipment** (such as the Peloton Bike and Tread), Peloton's fitness studios, and through mobile, desktop, or device applications (including iOS and Android applications ('Apps'))." Exhibit 4 to Mot., Peloton Terms of Service (Last Updated: September 14, 2018), ECF No. 11-6 ("Peloton Terms") at 2.

Any customer who purchases a Peloton product must subscribe to Peloton's All-Access Membership in order to gain access to the "full user experience" intended for the bicycle or treadmill, including access to Peloton's workout library, live classes, and real-time performance tracking on the device. Mot. at 7:4-7 (citing Feinberg Decl. at ¶ 5); *see also* Exhibit 1 to Mot., ECF No. 11-3 at 2 (showing a screenshot of the "Create Your Peloton Account" screen). In fact, Peloton automatically creates a Peloton account for purchasers of a new Tread+ who do not have a pre-existing Peloton account during

-2-

checkout, but the new membership charge will not begin until the customer activates the device. Feinberg Decl. at ¶ 5. When new purchasers of Peloton equipment create their account for Peloton's All-Access Membership, they must complete a sign-up process that requires them to accept the "Peloton Terms of Service." Mot. at 7:13-15 (citing Feinberg Decl., ¶ 7). New members can complete this process on either the Peloton website, their phones, or on a Peloton device, like the Tread+. Mot. at 7:15-17 (citing Feinberg Decl., ¶ 7). When registering on the Peloton website or mobile application, as Mr. Stern did, users see a series of screens that, *inter alia*, (1) present the user with instructions to read and agree to Peloton's Terms of Service, Privacy Policy and Membership Terms; (2) advise that these terms are also available at onepeloton.com with the phrases "Terms of Service," "Privacy Policy," and "Membership Terms" called out in underline and hyperlinked to pages displaying complete versions of each document; and (3) require the user to click a button confirming that the user agrees to the Terms. Mot. at 7:17-8:2 (citing Feinberg Decl., ¶ 7); *see also* Exhibit 3 to Mot., ECF No. 11-5 at 2 (showing a screen that requires new users to enter an e-mail and password and click the button "CREATE ACCOUNT," which has a phrase underneath it stating, "By creating an account, you agree to our Terms of Service, Privacy Policy and Membership Terms."). Users cannot complete the registration process without confirming that they have read and agreed to the Peloton Terms of Service, Privacy Policy, and Membership Terms. Mot. at 8:3-5 (citing Feinberg Decl., ¶ 7).

As part of their acceptance of Peloton's Terms of Service, Peloton members agree to arbitrate any disputes with Peloton. Mot. at 8:7-8. In fact, the first paragraph of the Terms of Service that applied when Mr. Stern created his Peloton account, stated: "[b]y registering as a member or by visiting, browsing, or using the Peloton Service in any way, you (as a 'user') accept and agree to be bound by these Terms of Service ('Terms'), which forms a binding agreement between you and Peloton." Mot. at 8:9-13 (citing Feinberg Decl. ¶ 8, Ex. 4 at p. 1); *see also* Exhibit 4 to Mot., ECF No. 11-6, Peloton Terms of Service at 2. The Terms also state that "[i]f you do not wish to be bound by

these Terms, you may not access or use the Peloton Service."  Mot. at 8:13-15; *see also*

Peloton Terms at 2.

In between these provisions, in a paragraph called out in all caps lettering with an introduction that states, "PLEASE READ," the Terms make clear that they contain a binding arbitration provision and class action waiver for any dispute with Peloton:

> PLEASE READ: THESE TERMS CONTAIN A BINDING ARBITRATION PROVISION AND CLASS ACTION WAIVER (SECTION 20).  **READ CAREFULLY, INCLUDING YOUR RIGHT, IF APPLICABLE, TO OPT OUT OF ARBITRATION**.  EXCEPT FOR CERTAIN TYPES OF DISPUTES DESCRIBED IN SECTION 20 BELOW, OR WHERE PROHIBITED BY LAW, BY ENTERING INTO THESE TERMS YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND PELOTON WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.

Mot. at 8:16-27.  The Peloton Terms of Service also state that "[y]ou must be at least 18 years old, or the age of legal majority in your jurisdiction of residence, to register with and use the Peloton Service."  *Id.*  "Minors that can safely fit the dimensions of the Peloton Bike may participate in live in-studio classes, provided that (a) they and their parent/guardian have signed a Peloton waiver and release; and (b) their parent/guardian is on site at all times."  *Id.*  The Terms also advise that "the Peloton Service is offered only for your personal, non-commercial use, and not for the use or benefit of any third party." *Id.* Finally, the Terms of Service contain the following arbitration provision:

> 20. ARBITRATION CLAUSE & CLASS ACTION WAIVER – IMPORTANT – PLEASE REVIEW AS THIS MAY AFFECT YOUR LEGAL RIGHTS. APPLICABLE TO THE FULL EXTENT PERMITTED BY LAW.
>
> a. Mandatory Arbitration of Disputes. ***We each agree that any dispute***, claim or controversy ***arising out of*** or relating to ***these Terms*** or ***the breach***, termination, enforcement, interpretation or validity thereof or the ***use of the Services*** or ***Content*** (collectively, "Disputes") ***will be resolved solely***

**by binding, individual arbitration** and not in a class, ~~representative or consolidated action or proceeding.~~ You and Peloton agree that the U.S. Federal Arbitration Act (or equivalent laws in the jurisdiction in which the Peloton entity that you have contracted with is incorporated) governs the interpretation and enforcement of these Terms and that you and Peloton are each *waiving the right to a trial by jury* or to participate in a class action. This arbitration provision shall survive termination of these Terms.

b. Exceptions and Opt-out. … [Y]ou will retain the right to opt out of arbitration entirely and litigate any Dispute if you provide us with written notice of your desire to do so by regular mail sent to the attention of Peloton's Legal Department at the Peloton address set out below within thirty (30) days following the date you first agree to these Terms.

c. Conducting Arbitration and Arbitration Rules. The arbitration will be conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules (the "AAA Rules") then in effect, except as modified by these Terms. The AAA Rules are available at www.adr.org or by calling 1-800-778-7879. A party who wishes to start arbitration must submit a written Demand for Arbitration to AAA and give notice to the other party as specified in the AAA Rules. The AAA provides a form Demand for Arbitration at www.adr.org.

… If your claim exceeds U.S. $10,000, the right to a hearing will be determined by the AAA Rules. Any arbitration hearings will take place in the county (or parish) where you live, unless we both agree to a different location. *The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the* interpretation, applicability, enforceability and *scope of this arbitration agreement*.

Exhibit 4 to Mot., ECF No. 11-6 at 11 (the "Arbitration Provision") (emphasis added).

The Terms of Service also state that "[i]f your contract for the Peloton Service is with Peloton Interactive, Inc.," as is the case here, the "Terms shall be governed by the

-5-

1  laws of the State of New York, United States of America, without regard to principles of

2  conflicts of law."   Exhibit 4 to Mot., ECF No. 11-6 at 12.   They also provide that

3  "exclusive jurisdiction for all Disputes that are not required to be arbitrated will be the

4  state and federal courts located in New York, New York, United States of America, and

5  you consent to the jurisdiction of those courts." Exhibit 4 to Mot., ECF No. 11-6 at 12.

6       On August 25, 2019, Mr. Stern created a Peloton account. Mot. at 7:8-9 (citing

7  Feinberg Decl., ¶ 6).  Almost three months later, on November 29, 2019, Mr. Stern

8  purchased a Peloton Treadmill[1] and created a new Peloton account under a different e-

9  mail during checkout. Mot. at 7:9-10 (citing Feinberg Decl., ¶ 6). On December 5, 2019,

10  the Tread+ was delivered, and Mr. Stern activated it with his original account. *Id.* at

11  7:10-12 (citing Feinberg Decl., ¶ 6).

12       Around March 2020, Mr. Stern was exercising on the Treadmill, his three-year-old

13  son, S.S., approached the rear of the Treadmill without Mr. Stern's knowledge and was

14  pulled under the 450 lbs. Treamdill with Mr. Stern's added body weight (150 lbs.+).

15  Complaint, ECF No. 1-2 ("Compl.") at 2-3, ¶ 1, 5, ¶ 10; Oppo. at 6:25-27. As soon as

16  Mr. Stern realized his child was stuck underneath the Treadmill, he dismounted and

17  attempted to remove him, but S.S. was repeatedly sucked back into the underside of the

18  Treadmill. *Id.*  Mrs. Stern eventually heard her son's cries for help and also came to see

19  what was happening.  *Id.*  Both parents attempted to pull S.S. from underneath the Tread+

20  by his hands, shoulders, and torso, but they were unable to successfully remove him. *Id.*

21  at 5-6, ¶ 11.  Eventually, Mr. Stern attempted to lift the Tread+ in an effort to free S.S.,

22  but this failed as well.  *Id.*  Finally, Mr. Stern was able to remove S.S. when Mrs. Stern

23  triggered the Tread+'s ripcord, which slowly caused the Tread+ to come to a delayed

24  halt.   *Id.*   Plaintiffs allege that S.S. sustained injuries along his arms and shoulders,

25  including but not limited to contusions along his torso, stomach, and ribs, as well as a

26

27  [1]    In September 2020, Peloton renamed its Treadmill the Tread+. Compl., ECF No.
1-2 at 3, ¶ 1.  The Tread+ is 72.5" L x 36.5" W x 72" H produces 2 horsepower and
28  propels the underlying belt at a speed of up to 12.5 mph. *Id.*

laceration and permanent scarring to his stomach. *Id.*

Around May 2021, Peloton issued a recall of its Tread+ Treadmills after the United States Consumer Product Safety Commission (the "CPSC") cautioned parents against the use of the machines due to the risk of injury and death. Compl. at 4, ¶ 3. The CPSC learned of numerous other incidents of children being sucked beneath the treadmills. *Id.*

### B.   Procedural History

On May 7, 2021, Plaintiffs filed suit against Peloton, alleging six causes of action for (1) negligence (by all plaintiffs); (2) negligent infliction of emotional distress (direct victim brought by S.S.); (3) negligent infliction of emotional distress (bystander brought by Mr. and Mrs. Stern); (4) intentional misrepresentation (brought by Mr. and Mrs. Stern); (5) negligent misrepresentation (brought by Mr. and Mrs. Stern); and (6) intentional concealment (brought by Mr. and Mrs. Stern). *See* Compl.

On July 29, 2021, Peloton timely filed a Notice of Removal. ECF No. 1 at 2:18.

On August 5, 2021, Peloton filed the instant Motion to Compel Arbitration and/or Dismiss or Stay the Case. ECF No. 11. On September 3, 2021, Plaintiff opposed. ECF No. 12. On or about September 13, 2021, Peloton replied. ECF No. 13.

## III.   LEGAL STANDARD

### A.   Motion to Compel Arbitration

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of a contract." 9 U.S.C. § 2. "Once the court has determined that an arbitration agreement relates to a transaction involving interstate commerce, thereby falling under the FAA, the court's only role is to determine [1] whether a valid arbitration agreement exists and [2] whether the scope of the dispute falls within that agreement." *Ramirez v. Cintas Corp.*, No. C 04-00281 JSW, 2005 WL 2894628, at *3 (N.D. Cal. Nov. 2, 2005) (citing 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).

### B.   **Motion to Dismiss Under Rule 12(b)(1)**[2]

Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Rule 12(b)(1)") allows a defendant to seek dismissal of a claim or lawsuit by asserting the defense of lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). "If the court determines at any time that it lacks subject matter-jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3). "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984-85 (9th Cir. 2008). "Although the defendant is the moving party in a motion to dismiss brought under Rule 12(b)(1), the plaintiff is the party invoking the court's jurisdiction." *Brooke v. Kashl Corp.*, 362 F. Supp. 3d 864, 871 (S.D. Cal. 2019). As a result, the plaintiff, as "[t]he party asserting jurisdiction[,] bears the burden of establishing subject matter jurisdiction on a motion to dismiss for lack of subject matter jurisdiction." *DRAM*, 546 F.3d at 984.

### D.   **Motion to Stay**

Where a plaintiff files suit "in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for . . . arbitration, the court in which such suit is pending, upon being satisfied that the issue . . . is referable to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration." 9 U.S.C. § 3. A court's power to stay proceedings is incidental to the inherent power to control the disposition of its cases in the interests of efficiency and fairness to the court, counsel, and litigants. *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). A stay may be granted pending the outcome of other legal proceedings related to the case in the interests of judicial economy. *Leyva v. Certified Grocers of Cal., Ltd.*, 593

---

[2]   Although Defendant labeled the Motion as "Motion to Compel Arbitration and to Dismiss or Stay the Action," Defendant's substantive Motion asks for the case to be either "dismissed or stayed pending the arbitration's conclusion." ECF No. 11 at 1. Thus, the Court construes the Motion as including a request to dismiss as well.

1 | F.2d 857, 863-64 (9th Cir. 1979). Discretion to stay a case is appropriately exercised
2 | when the resolution of another matter will have a direct impact on the issues before the
3 | court, thereby substantially simplifying the issues presented. *Mediterranean Enters., Inc.*
4 | *v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983). In determining whether a stay
5 | is appropriate, a court "must weigh competing interests and maintain an even balance."
6 | *Landis*, 299 U.S. at 254-55. "[I]f there is even a fair possibility that the stay . . . will
7 | work damage to some one else, the stay may be inappropriate absent a showing by the
8 | moving party of hardship or inequity." *Dependable Highway Express, Inc. v. Navigators*
9 | *Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (citation and quotation marks omitted).

10 | **IV.   DISCUSSION**

11 |          Peloton argues that Mr. Stern cannot proceed in Court with his claims because
12 | when he set up an account with Peloton at the time he purchased the Tread+, he agreed to
13 | be bound by Peloton's Terms of Service, which included a clear and conspicuous
14 | arbitration agreement covering Plaintiffs' claims in this case. Mot. at 6:3-8. Peloton
15 | points out that even after agreeing to arbitrate, Mr. Stern, like all registered Peloton users,
16 | had 30 days to provide Peloton with written notice that he wanted to opt out of the
17 | Arbitration Provision but never did. *Id.* at 6:9-11. Peloton also argues that under the
18 | Arbitration Provision, the arbitrator, rather than the Court, should decide the gateway
19 | issue of whether Plaintiffs' dispute falls under the Arbitration Provision. *Id.* at 6:12-19.

20 |          Plaintiffs respond by arguing that first, Peloton not only fails to provide "any
21 | evidence (credible or otherwise) that [Mr. Stern] **actually** accepted the Terms of Service"
22 | but also fails to explain how those Terms of Service would bind S.S. and Mrs. Stern, who
23 | Peloton acknowledges did not sign the Terms of Service. Oppo. at 4:8-20. Second,
24 | Plaintiffs point out that Defendant fails to provide any evidence that Mrs. Stern or her son
25 | ever had an account with Peloton, entered into any agreement with Peloton, or even used
26 | the Tread+. *Id.* at 4:21-26. Plaintiffs also note that in fact, "as a minor, S.S. was
27 | incapable of contracting with Defendant as a matter of law," and the Terms of Service
28 | even "**explicitly** prohibit minors from entering into the Terms of Service and utilizing the

1    Tread+ or Defendant's ecosystem." *Id.* at 5:4-10.  Third, Plaintiffs argue that even if

2    Peloton proved all three Plaintiffs accepted Peloton's Terms of Service, "Plaintiffs'

3    claims are not within the scope of the arbitration provision." *Id.* at 6:7-16.  Fourth,

4    Plaintiffs argue that to the extent the Court is inclined to grant the Motion in part as to

5    Mr. Stern, the Court should not stay the proceedings as to the remaining two plaintiffs

6    (*i.e.*, Mrs. Stern and S.S.). *Id.* at 6:17-19.  Finally, Plaintiffs argue that the Court should

7    not consider the Feinberg Declaration in support of Peloton's Motion, which seeks to

8    support its argument that Mr. Stern agreed to arbitrate, because it lacks foundation and

9    authentication. *Id.* at 5:11-28.

10        In reply, Peloton argues that even though Mrs. Stern and S.S. did not sign the

11   Arbitration Provision, they cannot avoid its consequences due to the state law principles

12   of equitable estoppel, which bind non-signatories to an arbitration agreement for claims

13   relating to the contract.  Reply at 5:10-13.  It contends that "[b]ecause of their preexisting

14   relationships with Mr. Stern, Mrs. Stern and S.S. are equitably estopped from avoiding

15   the Arbitration Agreement" because their claims "directly relate to the terms of [Mr.

16   Stern's] Tread+ account, which govern the use of the Sterns' [sic] Tread+." *Id.* at 5:13-

17   17.  Peloton requests that even if the Court finds that the claims of Mrs. Stern and her son

18   are not subject to arbitration, that it still send Mr. Stern's claims to arbitration and stay

19   the claims of Mrs. Stern and S.S. pending the outcome of Mr. Stern's arbitration

20   proceeding. *Id.* at 5:18-21.

21        As discussed below, the Court finds that first, no valid agreements to arbitrate exist

22   for Mrs. Stern and her child, S.S., who as a minor, lacks the capacity to contract with

23   Peloton.  Thus, the Court **DENIES** Peloton's Motion as to Mrs. Stern and S.S. However,

24   because an agreement to arbitrate exists between Mr. Stern and Peloton, and that

25   agreement expressly delegates the authority to decide whether a claim falls within the

26   scope of the Arbitration Provision to the arbitrator, not the Court, the Court **GRANTS**

27   Peloton's Motion as to Mr. Stern only.  Given the Court **DENIES** Peloton's Motion to

28   Compel Arbitration as to Mrs. Stern and S.S., the Court also **DENIES** Peloton's related

requests to stay or dismiss the case as to them as moot.  However, the Court **GRANTS** a sixty (60) day stay as to Mr. Stern only.  Finally, the Court **OVERRULES** Plaintiffs' Evidentiary Objections.

### A.   Jurisdiction

The FAA allows a party aggrieved by another party's failure to arbitrate to bring either an original petition to arbitrate, or where an action has already been filed, a motion to compel arbitration "in any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action . . . of the subject matter arising out of the controversy between the parties."  9 U.S.C. § 4.  Under 28 U.S.C. § 1331, "[t]he district courts . . . have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Plaintiffs filed suit under California law for various personal injuries.  Peloton removed on the basis of diversity jurisdiction 28 U.S.C. § 1332(a) because Plaintiff seeks more than $75,000.000 in damages and Peloton is a citizen of Delaware and New York, while Plaintiffs are citizens of California.  *See* ECF No. 1 at 2:26-3:10.   Thus, this Court has diversity jurisdiction over the underlying controversy, and thus, has jurisdiction to determine this Motion.

### B.   Federal Arbitration Act

The FAA provides that once a defendant files a motion to compel arbitration, a district court must "hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not" at issue, must "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  It "reflects both a 'liberal federal policy favoring arbitration' . . . and the 'fundamental principle that arbitration is a matter of contract.'"  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).  The district court's role in ruling on a motion to compel arbitration is "limited to determining (1) whether a valid agreement to arbitrate exists[,] and if it does, (2) whether the agreement encompasses the dispute at issue."

1 | *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020).  Only if the court answers

2 | both questions in the affirmative will the FAA require the Court "to enforce the terms of

3 | the arbitration agreement in accordance with its terms."  *Id.*  The Supreme Court has

4 | reminded that "courts should order arbitration of a dispute only where the court is

5 | satisfied that neither [1] the formation of the parties' arbitration agreement *nor* [2]

6 | (absent a valid provision specifically committing such disputes to an arbitrator) its

7 | enforceability or applicability to the dispute is in issue."  *Granite Rock Co. v. Int'l Bhd. of*

8 | *Teamsters*, 561 U.S. 287, 299 (2010) (emphasis in original).

9 | As outlined below, this Court finds that (1) Mrs. Stern and S.S. never formed an

10 | arbitration agreement with Peloton and (2) Mr. Stern formed an agreement to arbitrate,

11 | which contains an express delegation clause, requiring the arbitrator to determine whether

12 | his claims fall within the scope of the Arbitration Provision.

13 | ### 1.   *Governing Law*

14 | As a preliminary matter, federal substantive law governs the scope of an arbitration

15 | agreement.  *Kramer*, 705 F.3d at 1126.  "[A]s a matter of federal law, any doubts

16 | concerning the scope of arbitrable issues should be resolved in favor of arbitration,

17 | whether the problem at hand is the construction of the contract language itself or an

18 | allegation of waiver, delay, or a like defense to arbitrability."  *Chiron Corp. v. Ortho*

19 | *Diagnostic Sys., Inc.,* 207 F.3d 1126, 1131 (9th Cir. 2000).  State contract law, on the

20 | other hand, governs issues pertaining to the validity, revocability, and enforceability of an

21 | agreement to arbitrate.  *See, e.g., Revitch*, 977 F.3d at 716-17 (applying California

22 | contract law to a wireless services agreement because the agreement's choice-of-law

23 | provision states that the contract is governed by the law of the state in which the

24 | customer's billing address is located, and the customer resided in California).

25 | In this case, the Terms of Service state that "[i]f your contract for the Peloton

26 | Service is with Peloton Interactive, Inc., these Terms shall be governed by the laws of the

27 | State of New York, United States of America, without regard to principles of conflicts of

28 | law." Exhibit 4 to Motion, ECF No. 11-6 at 12.  However, it also requires application of

"the U.S. Federal Arbitration Act (or equivalent laws in the jurisdiction in which the Peloton entity that you have contracted with is incorporated)" to "the interpretation and enforcement of these Terms." *Id.* at 11. Thus, the Terms of Service require application of federal law to the scope of the Arbitration Provision, but New York law to the validity and enforceability of the agreement itself.

### 2. *Mr. Stern Signed a Valid Agreement to Arbitrate, but Mrs. Stern and S.S. Did Not*

Section 2 of the FAA governs enforcement of agreements to arbitrate and provides that a provision to settle by arbitration a controversy arising out of a contract covering a transaction involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also* 9 U.S.C. § 1 (defining "commerce" as "commerce among the several States"). This "savings clause" allows a party to challenge an arbitration agreement based on any state law contract defenses, such as fraud, mistake, duress, or unconscionability. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996).

Here, the Terms of Service were not literally signed by Mr. Stern, Mrs. Stern, or S.S.[3] While a writing exists between Peloton and Mr. Stern, no agreement whatsoever

---

[3] A court may take judicial notice of the fact that a contract was signed. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (holding that a district court could take judicial notice of "the *fact* that [a document] was signed"), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Wilbur v. Locke*, 423 F.3d 1101, 1112 (9th Cir. 2005), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010) (taking judicial notice of a consummated agreement in the form of an executed compact). Without taking judicial notice of the validity of the Terms of Service, the Court takes judicial notice of the fact that the agreement is not a fully executed contract as it is not signed by any of the parties but does explicitly provide that the "Terms begin on the date you first use the Peloton Service and continue as long as you have an account with us and/or continue to use the Peloton Service." Peloton Terms at 3. It also contained a provision expressly allowing Plaintiff to reject the arbitration provision by sending a written rejection notice to the address provided in the agreement. *Id.* at 11. Here, Mr. Stern used the Tread+ and never states that he sent a written notice of rejection to Peloton.

exists between Peloton and Mrs. Stern or Peloton and S.S.  However, Peloton argues that the Arbitration Provision can be enforced against them due to the doctrine of equitable estoppel.  The Court acknowledges those arguments in turn but finds them unavailing.

Identical to California law,[4] under New York law, the "[e]lements essential to existence of a contract are: (1) [p]arties capable of contracting; (2) [t]heir consent; (3) [a] lawful object; and (4) [s]ufficient cause or consideration." *Compare Prestige Brands, Inc. v. Guardian Drug Co.*, 951 F. Supp. 2d 441, 446 (S.D.N.Y. 2013) (noting that "[i]n order to form a valid and enforceable contract, it is essential that there be: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient consideration") *with Grimes v. New Century Mortg. Corp.*, 340 F.3d 1007, 1011 (9th Cir. 2003) (McKeown, J., dissenting) (citing CAL. CIV. CODE § 1550) (applying California law); *see also* Oppo. at 8:11-15.

Despite the requirement of mutual assent for a valid contract, "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1187-88 (9th Cir. 1986)). The principles allowing this to occur include where one or more of the following doctrines applies: (1) incorporation by reference; (2) assumption; (3) agency; (3) piercing the corporate veil or alter ego; and/or (5) estoppel. *See id.*; *see also Tamsco Props., LLC v. Langemeier*, 597 F. App'x 428, 429 (9th Cir. 2015). "Equitable estoppel precludes a

---

[4] Although the Terms of Service state that New York law applies, the Court compares California law throughout this order to show that even if California law applied, it would not change the outcome of this ruling. *See, e.g., Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 547 (S.D.N.Y. 2018) ("In any event, both California and New York, the state in which Plaintiffs reside, apply substantively similar law with respect to contract formation."); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (noting that "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term'"). The Court also notes that Peloton relies on Ninth Circuit and California case law in its Motion but argues that "New York law applies to the issue of whether a valid agreement to arbitrate exists." Mot. at 15:17-18.

1  party from claiming the benefits of a contract while simultaneously attempting to avoid

2  the burdens that contract imposes." *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166,

3  1169 (9th Cir. 2021) (quoting *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045

4  (9th Cir. 2009)).   Generally, California cases binding nonsignatories to an arbitration

5  either involve one of two scenarios: First, a nonsignatory might be required to arbitrate

6  because the contract conferred a benefit on the nonsignatory, making the nonsignatory a

7  third party beneficiary of the arbitration agreement.   *Cty. of Contra Costa v. Kaiser*

8  *Found. Health Plan, Inc.*, 47 Cal. App. 4th 237, 242 (1996) (applying California law);

9  *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) (applying

10  New York law).   Second, a preexisting relationship might exist between the nonsignatory

11  and one of the parties to the arbitration agreement, making it equitable to compel the

12  nonsignatory to arbitration. *Contra Costa*, 47 Cal. App. 4th at 242.

13       Neither party argues that the third and fourth elements of whether the agreement

14  has lawful object or is supported by sufficient consideration is at issue.   Thus, the Court

15  treats those elements as established and not in dispute.   However, as to the remaining

16  issues, the Court finds that (1) even if S.S. had accepted the Arbitration Provision, he was

17  not a party capable of contracting, and (2) as to Mrs. Stern and S.S., no manifestation of

18  mutual assent exists to bind her to the Terms of Service.   Thus, the Arbitration cannot be

19  enforced against Mrs. Stern or S.S.   As to Mr. Stern, however, a valid agreement to

20  arbitrate exists between him and Peloton, leaving the outstanding issue of whether his

21  claims fall within the purview of the Arbitration Provision.

22             a.   *S.S. Was Not a Party Capable of Contracting*

23       Peloton's Motion fails to address how or why the Arbitration Provision should

24  apply to Mrs. Stern and S.S., who did not accept the Terms of Service.   Plaintiffs argue

25  that not only does Defendant fail to establish the formation of a valid contract with S.S.,

26  but in fact, "Defendant's Motion must fail because S.S. was incapable of contracting with

27  Defendant as a matter of law."   Oppo. at 8:25-9:15.   In reply, Peloton argues that in spite

28  of S.S.'s infancy, the Arbitration Provision applies under the doctrine of equitable

estoppel. *See* Reply at 11-14 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (recognizing that non-signatories of arbitration agreement may be bound by the agreement under traditional principles of state contract law such as estoppel).

Both New York and California law mandate that a minor under the age of eighteen (18) years old lacks the capacity to enter into a contract. *See, e.g.*, N.Y. C.P.L.R. Law § 1209, 1557; *see also* CAL. FAM CODE §§ 6500. Further, both states also indicate that even if a minor enters into a contract before the age of majority, the minor can disaffirm that contract. *See* N.Y. C.P.L.R. Law §§ 1209, 1210(a); CAL. CODE CIV. PROC. § 372(a)(1); CAL. FAM CODE §§ 6700 (providing that "a minor may make a contract in the same manner as an adult, subject to the power of disaffirmance under . . . Section 6710[ ] and subject to . . . Section 300"), 6710 ("Except as otherwise provided by statute, a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards . . . ").

Peloton argues that the following cases applying the principal of equitable estoppel justify this Court holding Mrs. Stern and S.S. to the Arbitration Provision: *Bolanos v. Khalatian*, 231 Cal. App. 3d 1586, 1591 (1991); *Doyle v. Giuliucci*, 62 Cal. 2d 606, 607-609 (1965); *Teel v. Aaron's, Inc.*, No. 3:14-cv-640-J-32PDB, 2015 U.S. Dist. LEXIS 37140, at *1-3, 20 (M.D. Fla. Mar. 24, 2015). *See* Reply at 12:1-13:18. However, the Court finds these case inapposite as *Bolanos* and *Doyle* both involved contracts entered into **on behalf of the child** for medical services **for the child**. *See, e.g.*, *Bolanos*, 231 Cal. App. 3d at 1591 (reversing the lower court's decision denying a motion to for an order compelling arbitration in a medical malpractice action brought by a father, mother, and child arising out of the defendant-obstetrician's alleged negligent care to the mother when delivering her child); *Doyle*, 62 Cal. 2d at 607-609, 611 (affirming decision holding that the contract between the plaintiff-minor's father and the defendants required arbitration, where the father entered into a contract for medical services, which expressly provided for "care and service to dependents of the Subscriber [plaintiff's father]," and required arbitration of such claims arising out of care to dependents). Further, in *Teel v. Aaron's,*

-16-

1 *Inc.*, No. 3:14-cv-640-J-32PDB, 2015 U.S. Dist. LEXIS 37140, at *1-3, 20 (M.D. Fla.
2 Mar. 24, 2015), the Florida Middle District Court granted the defendant's motion to
3 dismiss or stay proceedings and compel arbitration of the plaintiffs' claims against a
4 furniture rental company, which allegedly delivered bunk beds infested with bed bugs
5 and black mold.  The two plaintiff-parents brought suit individually and as guardians ad
6 litem of their five minor children.  *Id.* at *2.  The court noted that even though the father
7 and children never signed the lease purchase agreement or arbitration agreement with the
8 defendant, they relied on the existence of the unsigned documents in each of their claims
9 in the complaint.  *Id.* at *19.  The court reasoned that by relying on the existence of the
10 agreements to establish his claims but repudiating its existence when it came to the
11 arbitration provision, the father was "trying to 'has his cake and eat it too.'"  *Id.*

12      Peloton argues that as in *Teel*, "Plaintiffs' complaint relates to the contract between
13 Mr. Stern and Peloton and thus, justifies binding all three Plaintiffs to the Arbitration
14 Agreement."  Reply at 13:23-25.  However, none of the aforementioned cases involve a
15 court compelling a child to arbitrate after the child was injured by a product where only
16 the parent (not the child) had signed an arbitration agreement relating to the parents' own
17 use (rather than the child's use) of a service ancillary to the product's use.  This case is
18 unique.  It also does not require arbitration, even under the doctrine of equitable estoppel.
19 *See also In re Ring LLC Privacy Litig.*, No. CV 19-10899-MWF (RAOx), 2021 U.S.
20 Dist. LEXIS 118461, at *29 (C.D. Cal. June 24, 2021) (denying a motion to compel
21 arbitration with respect to non-purchaser plaintiffs,  noting that the district court cases
22 binding non-signatory family members to adhesion contracts for consumer goods were
23 both not binding and "relied upon California authorities such as *County of Contra*
24 *Costa* without addressing the distinction between contracts for medical services and
25 adhesion contracts for consumer goods").

26      Additionally, Mrs. Stern signed a declaration in support of Plaintiffs' Opposition,
27 stating under penalty of perjury that she is S.S.'s primary caretaker, actively monitors and
28 limits his access to electronics (including smartphones, computers, and tablets), does not

permit him to use the Tread+, and he has never utilized the Tread+.   Declaration of Eunjin Stern, ECF No. 12-1 ("Stern Decl.") at 3, ¶ 8.   Thus, unlike the children in *Bolanos* and *Doyle*, who benefited from the medical services provided under the contract containing the arbitration agreement, S.S. never benefitted from the services provided by Peloton.  Instead, S.S. was harmed by Mr. Stern's use of Peloton's products and services.

The Court finds this case more akin to *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1057 (7th Cir. 2018) (applying Nevada law), where the Seventh Circuit held that a minor-plaintiff was not bound by the terms of a cardholder agreement containing an arbitration clause between his mother and the defendant.  The child, A.D., by and through his mother as guardian ad litem, brought a putative class action for violations of the Telephone Consumer Protection Act.  *Id.* at 1057.  The defendant moved to compel arbitration based on a cardholder agreement between itself and the child's mother.  *Id.*  In deciding that the plaintiff-child could not be bound by the agreement, the court noted that A.D. was "not bound by the terms of the cardholder agreement to arbitrate with Credit One" and had "not directly benefited from the cardholder agreement such that equitable principles" warranted application of the arbitration clause against her.  *Id.*

The *A.D.* court reasoned that first, "it is a fundamental principle of arbitration law that 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  885 F.3d at 1062 (citing *United Steelworkers*, 363 U.S. at 582).  Like S.S. in this case, "A.D. simply did not consent to arbitrate with Credit One."  *Id.* at 1062.  "More fundamentally, A.D. did not have legal capacity to enter into a contractual relationship with Credit One."  *Id.*  Further, even if A.D. had entered into the contract, "minors . . . can disaffirm their obligations under contracts formed before they reach the age of eighteen," so "certainly [by filing the lawsuit, A.D.] engaged in an act of disaffirmation."  *Id.*

Like Peloton, the *A.D.* defendant tried to advance an estoppel argument.  885 F.3d at 1064.  The court explained that "[e]stoppel is an equitable doctrine that prevents a non-signatory from refusing to comply with an arbitration clause when it receives a direct

-18-

benefit from a contract containing an arbitration clause." *Id.* at 1064 (internal quotations omitted); *see also Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) ("A nonsignatory is estopped from refusing to comply with an arbitration clause 'when it receives a 'direct benefit' from a contract containing an arbitration clause.'"). The defendant argued A.D. directly benefitted from the cardholder agreement because the mother asked A.D. to make purchases with the card. *Id.* However, the court noted that any benefit A.D. received by using the card was limited to following her mother's directions when using the card, which created a mother-daughter relationship but meant A.D. had no relationship, contractual or otherwise, with the defendant. *Id.* Thus, A.D. "derived no direct benefit from the cardholder agreement." *Id.* Instead, the child's mother, not the child, "benefit[ted] from the agreement, which allowed her, not A.D., to buy" items. *Id.* Thus, the court rejected the defendant's argument and concluded the arbitration clause did not apply to the child. *Id.* at 1065.

Unlike *A.D.*, in *Cutway v. S.T.A.R. Programs, Inc.*, 904 N.Y.S.2d 806, 807 (2010), the court granted the defendants' motion to compel arbitration based upon agreements the plaintiff-parents had signed prior to their children's participation in a boot camp program, which contained an arbitration clause. The *Cutway* plaintiffs, who filed suit individually as well as on behalf of their children against the defendants, who ran the boot camp for troubled youth, contending that their children sustained injuries while participating in the bootcamp. *Id.* The court enforced the arbitration agreement recognizing "the weight of authority from other jurisdictions recognizes the enforceability of an arbitration provision when a parent executes an agreement that benefits the ... child and the agreement contains an arbitration provision regarding the child's potential future tort claims." *Id.*

As in *A.D.*, the Arbitration Provision at issue in this case is between the parent, Mr. Stern, and Peloton but only benefited the parent, not the child. 885 F.3d 1064. Further, like A.D., S.S. also lacked the ability to consent and maintained the ability to disaffirm the contract. *Id.* at 1062. Further, unlike *Cutway*, the parent who signed the Arbitration Agreement in this case signed on his own behalf, not on behalf of his child. 904

-19-

1  N.Y.S.2d 806, 80.  Thus, that case also does not support granting Defendant's Motion.

2  *See also Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1074, 1077-78 (5th

3  Cir.), *opinion supplemented on denial of reh'g*, 303 F.3d 570 (5th Cir. 2002) (holding

4  that "because the Gaskamp children are not signatories to the contract or third-party

5  beneficiaries thereof, and because they have not sought to enforce the contract, the

6  children cannot be required to arbitrate").

7        Accordingly, S.S.'s age of minority and failure to qualify as a beneficiary prevents

8  Peloton from enforcing the Arbitration Provision against S.S.

9                              b.    *Mutual Consent*

10       As stated, Peloton also argues that even though neither Mrs. Stern nor S.S. signed

11  its Terms of Service, they should both be bound by the Arbitration Agreement due to the

12  doctrine of equitable estoppel.  *See generally* Mot.; Reply at 11-14.  The Court has

13  already addressed how and why the Court cannot compel S.S. to arbitrate.  Accordingly,

14  it addresses whether mutual consent exists for the only remaining two parties who could

15  be compelled to arbitrate: Mrs. Stern and Mr. Stern.

16       The FAA "leaves no place for the exercise of discretion by a district court, but

17  instead mandates that district courts shall direct the parties to arbitration on issues as to

18  which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*,

19  470 U.S. 213, 218 (1985).  However, "a party cannot be required to submit to arbitration

20  any dispute which he has not agreed so to submit." *United Steelworkers of Am. v.

21  Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960).  That being said, "[w]hile the FAA

22  'requires a writing, it does not require that the writing be signed by the parties.'" *Nghiem

23  v. NEC Elec., Inc.*, 25 F.3d 1437, 1439-40 (9th Cir. 1994).  Thus, in order to compel

24  arbitration, a court must find some manifestation of mutual assent to arbitrate.

25       Under both New York and California law, "mutual assent is essential to the

26  formation of a contract and a party cannot be held to have contracted if there was no

27  assent or acceptance." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427-28 (2d Cir.

28  2004) (noting that "[t]o form a valid contract under New York law, there must be an

-20-

offer, acceptance, consideration, mutual assent and intent to be bound."); *see also* CAL. CIV. CODE § 1550; *Warner Bros. Int'l TV Distribution v. Golden Channels & Co.*, 522 F.3d 1060, 1069 (9th Cir. 2008) (applying California law). "The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." *Register.com*, 356 F.3d at 427; *see also Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) ("Mutual assent may be manifested by written or spoken words, or by conduct, and acceptance of contract terms may be implied through action or inaction.") (applying California law) (internal quotations and citations omitted); CAL. CIV. CODE § 1565 ("Consent of the parties to a contract must be: (1) [f]ree; (2) [m]utual; and (3) [c]ommunicated by each to the other.").

In order to compel Mrs. Stern and Mr. Stern to arbitrate their claims, Peloton must show that both individuals manifested mutual assent to Peloton's Terms of Service containing the Arbitration Provision. The Court finds Peloton met this showing as to Mr. Stern but not Mrs. Stern.

### i.   Mrs. Stern

Plaintiffs argue that Defendant fails to establish the formation of an agreement to arbitrate with Mrs. Stern. Oppo. at 8:25-9:15. They also contend that Peloton has failed to establish that Mr. Stern accepted Peloton's Terms of Service, thereby creating a valid contract between himself and Peloton. Oppo. at 9:28-10:1. Peloton replies that Mr. Stern's agreement to the Arbitration Provision binds Mrs. Stern under the equitable estoppel doctrine. Reply at 11:21-24 (citing *Arthur*, 556 U.S. at 631). It contends that "the non-signatory spouse (Ms. Stern) and child (S.S.) are bound to Mr. Stern's Arbitration Agreement based on their preexisting relationship with Mr. Stern." *Id.* at 11:25-28 (citing *Tice v. Amazon.com, Inc.*, 845 F. App'x 535, 537 (9th Cir. 2021)).

As to Mrs. Stern, Peloton argues that the cases of *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 258, 279 (E.D.N.Y. 2019), *aff'd in* 815 F. App'x 612, 613-14 (2d Cir. 2020) and *Tice v. Amazon.com, Inc.*, No. 5:19-cv-1311-SVW-KK, 2020 U.S. Dist.

-21-

1   LEXIS 60597, at \*1-2 (C.D. Cal. Mar. 25, 2020) justify this Court applying the principal

2   of equitable estoppel to hold Mrs. Stern to the Arbitration Provision:. *See* Reply at 12:1-

3   13:18. However, as with Peloton's arguments with respect to S.S., the Court finds these

4   cases inapposite as they all involved a spouse who used or benefited from the product for

5   which the other spouse signed a binding arbitration agreement.

6        First, in *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 258, 279 (E.D.N.Y.

7   2019), *aff'd in* 815 F. App'x 612, 613-14 (2d Cir. 2020) the court granted the defendant's

8   motion to compel arbitration. The plaintiff, Dean Nicosia, went on Amazon.com to order

9   weight loss supplements, which contained a harmful compound and later sued claiming

10  the defendant's sale of the product violated various consumer safety laws. *Id.* at 257-58,

11  262. In purchasing the weight loss supplements, he used an Amazon account listed under

12  his wife's name but which both he and his wife used. *Id.* at 258. However, as part of his

13  wife's registration for that account, she had to accept the Amazon Prime Terms and

14  Conditions, which incorporated an arbitration provision. *Id.* Both the district court and

15  Second Circuit Court of Appeals bound the husband to the arbitration clause under the

16  principles of equitable estoppel even though he never received notice of the clause. *Id.* It

17  reasoned that the "[p]laintiff's use of the Account was tantamount to a representation that

18  he *was* Annemarie Nicosia (and therefore bound by the arbitration provision to which she

19  had previously agreed)." *Id.* at 274. "I[n] equity and fairness, he should be bound by the

20  consequences of that representation as though it were true." *Id.*

21       Similarly, in *Tice v. Amazon.com, Inc.*, No. 5:19-cv-1311-SVW-KK, 2020 WL

22  1625782, 2020 U.S. Dist. LEXIS 60597, at \*1-2 (C.D. Cal. Mar. 25, 2020), the district

23  court granted in part defendant-Amazon's motion to compel arbitration of two of the

24  plaintiff's three claims stemming from her husband's purchase of an Alexa Echo Dot

25  device. Amazon required all users to agree to its general Terms of Use ("TOU"), which

26  included an arbitration clause. *Id.* The plaintiff contended that even though her husband

27  consented to his voice being recorded by agreeing to the Alexa TOU, she did not because

28  she, unlike her husband, never agreed to the TOU. *Id.* However, like the husband in

*Nicosia*, the spouse did "not deny that she [was] an Amazon user." *Id.* at *2-3. The plaintiff alleged that Alexa's recording of her conversations violated various wiretapping laws. *Id.* at *3. The district court reasoned that due to both the spousal relationship as well as the voluntary use of Alexa, the wife could not avoid arbitration:

> Considering Plaintiff's allegations and the relevant caselaw, the Court finds that the preexisting spousal relationship in this case prevents Plaintiff from avoiding the terms of the Alexa TOU. Just as her husband would be bound to arbitrate claims relating to his voluntary use of Alexa, Plaintiff must adhere to the Alexa TOU for claims directly related to her voluntary usage. Plaintiff is therefore equitably estopped from avoiding the Arbitration Clause when she voluntarily utilizes Alexa.

*Id.* at *3.

On appeal, the Ninth Circuit Court of Appeals affirmed the lower court's decision except with respect to the claims for which it had failed to compel arbitration. *Tice v. Amazon.com, Inc.*, 845 F. App'x 535, 537 (9th Cir. 2021). As to those claims, the court held that the lower court erred by failing to compel all claims to arbitration because it was for the arbitrator, not the court, to decide whether the third claim fell within the scope of the arbitration clause. *Id.*

Peloton argues that "as in *Tice* and *Teel*, Plaintiffs'' complaint relates to the contract between Mr. Stern and Peloton and thus, justifies binding all three Plaintiffs to the Arbitration Agreement." Reply at 13:23-25. It contends that Mrs. Stern alleges damages along with her husband for misrepresentation and intentional concealment claims based on the cost to both of them to purchase and maintain the Tread+. *Id.* at 13:25-14:1 (citing ECF No. 1-2 at ¶¶ 27, 29, 33, 36). Thus, it asserts that their use and purchase of the Tread+ are governed by the Terms of Service, so the Court must send the entire case to arbitration because all of Plaintiffs' claims related to use of the Tread+ linked to Mr. Stern's account, including S.S.'s claims and Mrs. Stern's derivative claims. *Id.* at 14:1-5. However, Mrs. Stern signed a declaration submitted under penalty of perjury, stating that she has never (1) purchased any products from Peloton; (2) used any products from Peloton, including a Tread+ Treadmill; (3) created an account with

Peloton; (4) accessed anyone else's Peloton account; or (4) entered into an arbitration agreement with Peloton. Stern Decl. at 2-3, ¶¶ 4-6. Consequently, unlike the spouses in *Nicosia* and *Tice*, who each used the products purchased by or registered under the name of their spouse who had agreed to Amazon's terms containing the arbitration provision, Mrs. Stern never used the Tread+, nor did she benefit from it. *Compare see Nicosia*, 384 F. Supp. 3d (describing how the husband used his wife's Amazon account under her name); *Tice*, 2020 WL 1625782, *3 (discussing how the wife voluntarily used Alexa) *with* Stern Decl. at 2, ¶ 4 (stating that Mrs. Stern has never used any Peloton products, created an account with Peloton, or used a Peloton account under anyone else's name). Further, unlike *Teel*, where the court compelled the husband who did not sign the furniture lease agreement to arbitrate because he relied on the agreement's existence in his claims brought against the defendant, Mrs. Stern's own claims do not depend on the terms in Peloton's Terms of Service. 2015 U.S. Dist. LEXIS 37140, at *19.

In sum, none of the cases cited by Peloton warrant applying the doctrine of equitable estoppel in this case to force Mrs. Stern, a nonsignatory to Peloton's Terms of Service containing the Arbitration Provision, to arbitrate claims given she never used or benefited from the Tread+ or Peloton's Services. Thus, Peloton's Motion to Compel Arbitration is **DENIED** as to Mrs. Stern.

ii. <u>Mr. Stern</u>

Finally, as to Mr. Stern, Peloton argues that "the presentation of the Arbitration Agreement and the process for manifesting consent to its terms confirm that mutual assent is present" because Mr. Stern signed up for a Peloton account. Mot. at 16:10-12 (citing Feinberg Decl. ¶ 6). Peloton states that when he signed up for the Peloton account, he necessarily (1) was presented with a conspicuous hyperlink to a full copy of the Terms of Services, including the Arbitration Provision, and (2) affirmatively clicked the button indicating that he agreed to the Terms of Service. Mot. at 16:12-16 (citing Feinberg Decl. ¶ 7). Through the hyperlink, Mr. Stern had the chance to easily access and review the terms to which he was agreeing. Mot. at 16:16-17. Thus, Peloton

1    contends that Mr. Stern was on notice that by creating his Peloton account, he was
2    consenting to Peloton's Terms of Service, including the Arbitration Provision. *Id.* at
3    16:17-19.  Peloton also correctly points out that whether he read the terms or not, Mr.
4    Stern was put on constructive notice of the Arbitration Provision. *Id.* at 16:20-17:2.
5    Plaintiffs oppose by arguing that Peloton has failed to establish that Mr. Stern accepted
6    Peloton's Terms of Service.  Oppo. at 9:28-10:1.

7         "Although the Internet age has certainly introduced new twists with regard to
8    entering into contracts, the fundamental elements of contract law, including mutual
9    assent of the parties, have not changed." *Plazza*, 289 F. Supp. 3d at 547 (applying New
10   York and California law).  That being said, "[m]utual assent does not require that the
11   offeree have actual notice of the terms of an arbitration agreement." *Dohrmann v. Intuit,*
12   *Inc.*, 823 F. App'x 482, 483 (9th Cir. 2020) (applying California law).  "Instead, an
13   offeree is bound by an arbitration clause if 'a reasonably prudent Internet consumer'
14   would be put on 'inquiry notice' of the 'agreement's existence and contents.'" *Id.*; *see*
15   *also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74-75 (2d Cir. 2017) ("Where there is no
16   evidence that the offeree had actual notice of the terms of the agreement, the offeree will
17   still be bound by the agreement if a reasonably prudent user would be on inquiry notice
18   of the terms.").

19        Courts in the Second "Circuit have upheld 'Sign-In Wrap' agreements where
20   plaintiffs did not even click an 'I Accept' button, but instead clicked a 'Sign Up' or 'Sign
21   In' button where nearby language informed them that clicking the buttons would
22   constitute accepting the terms of service." *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d
23   36, 48 (E.D.N.Y. 2017); *see also Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 50
24   (E.D.N.Y. 2017) (noting that "failure to read a contract is not a defense to contract
25   formation").  Similarly, the Ninth "Circuit has indicated a tolerance for the single-click
26   'Sign Up' and assent practice" given "[c]ourts have held that a modified or hybrid
27   clickwrap/browsewrap agreement constitutes a binding contract where the user is
28   provided with an opportunity to review the terms of service in the form of a hyperlink

immediately under the 'I Accept' button and clicks that button." *See In re Facebook Biometric Info. Priv. Litig..*, 185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016) (citing *Crawford v. Beachbody, LLC*, No. 14cv1583–GPC (KSC), 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014)).  Further, it is of no consequence whether the consumer actually clicks a hyperlink to read the terms containing the arbitration provision or not.  *See, e.g., Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839-40 (S.D.N.Y. 2012) (holding that, when a consumer is prompted to examine terms of sale located on another page available via hyperlink, "[w]hether or not the consumer bothers to look is irrelevant" because "[f]ailure to read a contract before agreement to its terms does not retrieve a party of its obligations under the contract"); *see also Conyer v. Hula Media Servs., LLC*, 53 Cal. App. 5th 1189, 1197 (2020), *review filed* (Oct. 5, 2020) (noting that "[i]t has long been the rule in California that a party is bound by a contract even if he did not read the contract before signing it").

Here, the Court finds that Mr. Stern cannot reasonably dispute agreeing to Peloton's Terms of Service.  The evidence indicates he did, and Mr. Stern failed to rebut that evidence by providing a declaration attesting to the fact that he did not agree or later opted out of the Arbitration Provision.  Thus, a valid agreement to arbitrate exists between Mr. Stern and Peloton.  However, in order for arbitration to be compelled, the Court must also find that the Mr. Stern's claims involve interestate commerce and are encompassed by the Arbitration Provision.

### 3.   *Mr. Stern's Claims Involve Interstate Commerce*

Peloton argues that "the FAA applies to agreements that evidence a transaction involving interstate commerce, such as the use of cellular technologies and the internet at issue." Mot. at 11:27-12:5 (citing, *inter alia*, 9 U.S.C. §§ 1-2).  Peloton contends that Mr. Stern consented to the Arbitration Provision "in order to create an online Peloton account and gain full access to Peloton's workout library, live classes, and real-time performance tracking on the device."  Mot. at 12:6-8 (citing Feinberg Decl. ¶ 6).  Peloton's position is that because Plaintiff's injuries arose while he was using his Peloton, which required that

-26-

1   he log onto the Peloton interface, which requires use of the internet, this case involves
2   interstate commerce.  Mot. at 12:8-12 (citing *United States v. Sutcliffe*, 505 F.3d 944, 953
3   (9th Cir. 2007) (agreeing with the Eight Circuit Court of Appeals that "the Internet is an
4   instrumentality and channel of interstate commerce")).

5         Subject to certain exceptions inapplicable here, the FAA "governs arbitration
6   agreements in contracts involving interstate commerce." *Shivkov v. Artex Risk Sols., Inc.*,
7   974 F.3d 1051, 1058-60 (9th Cir. 2020) (applying Arizona contract law); *see also N.Y.*
8   *Stock Exch. Arbitration v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 120 (2d Cir.
9   1991) ("The FAA applies when there is federal subject matter jurisdiction, *i.e.*, diversity
10  jurisdiction, and when the contract calling for arbitration 'evidences a transaction
11  involving interstate commerce.'") (internal citations omitted) (applying New York law).
12  Thus, for the Court to compel arbitration under the FAA, the Terms of Service must
13  relate to a transaction involving interstate commerce.  Section 1 of the FAA defines
14  "commerce" as "commerce among the several States."  9 U.S.C. § 1.

15        Here, "the contract calling for arbitration" is the Terms of Service, which relates to
16  use of Peloton's electronic services meant to be used when "Users" are on their products
17  (*e.g.*, their bicycles and treadmills). To the extent the contract pertains to use of Peloton's
18  Services (*e.g.*, its app, website, and on-demand fitness classes), because those services
19  require use of the Internet, the Agreement would involve interstate commerce.  *See, e.g.,*
20  *United States v. Jackson*, 851 F. App'x 35, 36 (9th Cir. 2021) (noting that the Ninth
21  Circuit has "held that the Internet is an instrument of, and intimately related to, interstate
22  commerce").  Even interpreting the Agreement more liberally to apply to the sale of
23  Peloton's Tread+ to Mr. Stern, that sale would also involve interstate commerce to the
24  extent Peloton shipped the Tread+ to Mr. Stern from another state.  *See, e.g., United*
25  *States v. Hill*, 248 U.S. 420, 424 (1919) (noting that "[t]he transportation of one's own
26  goods from State to State is interstate commerce").

27        Thus, the Court finds that the sale of the Tread+ and use of the streaming services
28  involve interstate commerce.

4.   ***Whether Mr. Stern's Claims Fall within the Scope of the Arbitration Provision***

Peloton argues that its Arbitration Provision contains an express delegation clause, which clearly and unmistakably delegates the job of interpreting the scope of the Arbitration Provision to the arbitrator. Mot. at 13:1-19. Peloton also points out that the Arbitration Provision expressly incorporates the AAA Commercial Rules, which evidences an intent by the parties to have the arbitrator decide the issue of whether the instant dispute falls within the scope of the Arbitration Provision. *Id.* at 13:20-14:15. Thus, Peloton argues that this Court should refrain from deciding whether Mr. Stern's claims fall within the scope of the Arbitration Provision and submit the issue of the arbitrability of this case to the arbitrator. *See id.* Plaintiffs respond that "the delegation clause in the arbitration agreement is . . . ineffective" because Peloton fails to establish the Arbitration Provision is enforceable. *See* Oppo. at 12:8-12 (citing *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 232 (3d Cir. 2018) (providing that where the arbitration provision is not enforceable, the delegation clause contained therein is also unenforceable).

"[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent–A–Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). Where the parties to an arbitration agreement "clearly and unmistakably" agree that an arbitrator will decide gateway issues, the arbitrator, rather than the Court, will decide those issues. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). "Such [c]lear and unmistakable evidence of agreement to arbitrate arbitrability might include . . . a course of conduct demonstrating assent . . . or . . . an express agreement to do so." *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (citations and internal quotation marks omitted). "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract" and "possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529

(2019); *see also Mobile Real Estate, LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 470 (S.D.N.Y. 2020) (noting that where parties agree to an arbitration agreement which incorporates the AAA Commercial Arbitration Rules, which provide that the arbitrator has the power to rule on his or her own jurisdiction, that qualifies as "clear and unmistakable" evidence of intent to delegate questions of arbitrability) (citing American Arbitration Association, *Commercial Arbitration Rules and Mediation Procedures* ("AAA Rules") R-7(a) (July 1, 2016), https://adr.org/sites/default/files/Commercial%20 Rules.pdf). This remains "true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein*, 139 S. Ct. at 529.

Here, the Arbitration Provision includes a provision that states that "[t]he parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement." Exhibit 4 to Mot., ECF No. 11-6 at 11 (emphasis added); *see also* Mot. at 9:24-28. It also provides that "[t]he arbitration will be conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules (the "AAA Rules") then in effect, except as modified by these Terms," which it states "are available at www.adr.org or by calling 1-800-778-7879." *Id.* Those rules vest the arbitrator with the power to (1) "rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim and (2) "determine the existence or validity of a contract of which an arbitration clause forms a part." *See* American Arbitration Association, Consumer Arbitration Rules, R-14(a)-(b) (Rules Amended and Effective September 1, 2014), https://adr.org/sites/default/files/Consumer-Rules-Web.pdf. Based on the language of the Arbitration Provision, the Court finds that Mr. Stern and Peloton agreed to arbitrate gateway issues, including whether Mr. Stern's claims fall within the scope of the Arbitration Provision. *See, e.g., Crooks* v. *Wells Fargo Bank, NA.,* 312 F. Supp. 3d 932, 937-38 (S.D. Cal. 2018) (Sabraw, J.) ("To respect the province of the arbitrator, no opinion

1  is expressed on whether the ... claim falls within the scope of the arbitration provision.").

2       Here, the Court's duty was to decide if a valid agreement to arbitrate exists
3  between Mr. Stern and Peloton, and if so, whether that agreement delegated the decision
4  to decide whether claims fall within its scope to the arbitrator.  Having answered both
5  question in the affirmative as to Mr. Stern only, the Court orders Mr. Stern and Peloton to
6  arbitrate whether his claims are covered by the Arbitration Provision.

7       **C.   Plaintiff's Evidentiary Objections**

8       A district court ruling on a motion to compel arbitration must apply a "standard
9  similar to the summary judgment standard of Federal Rule of Civil Procedure 56." *Lopez*
10 *v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1097 (S.D. Cal. 2018) (Anello, J.)
11 (quoting *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004)); *Three*
12 *Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991).  In
13 that vein, "[a] party may object that the material cited to support or dispute a fact cannot
14 be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).
15 However, the Court will consider the substance of evidence that would be admissible at
16 trial even if the form of the evidence is improper so long as that same evidence may be
17 admissible in another form.  *See, e.g., Dinkins v. Schinzel*, 362 F. Supp. 3d 916, 922-23
18 (D. Nev. 2019) (noting that "the 2010 amendments to Federal Rule of Civil Procedure 56
19 'eliminate[d] th[is] unequivocal requirement' and mandate only that the substance of the
20 proffered evidence would be admissible at trial"; declining to "disregard all exhibits for
21 lack of proper authentication because their substance could be admissible at trial").

22       Before an item of evidence may be considered, Federal Rule of Evidence 901(a)
23 requires a proper foundation be laid to authenticate the item by "evidence sufficient to
24 support a finding that the item is what the proponent claims it is." *Canada v. Blain's*
25 *Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir. 1987).  Such a foundation may be laid by
26 testimony of a witness with personal knowledge. FED. R. EVID. 901(b)(1).  Thus, in order
27 for Mr. Feinberg to authenticate the Terms of Service, he must be a "witness with
28 knowledge . . . that [the document] is what it is claimed to be." FED. R. EVID. §

-30-

1   901(b)(1).

2        Defendants rely on declarations from Daniel Feinberg, a Senior Product Manager

3   at Peloton, to establish that Mr. Stern registered for a Peloton account and accepted

4   Peloton's Terms of Service.  *See generally* Feinberg Decl., ECF No. 11-2.  Plaintiffs

5   argue that Mr. Feinberg's Declaration (1) does not fully explain what account

6   information the declarant looked at or how that information is maintained; (2) does not

7   attach a copy of the account information in violation of the "best evidence rule"; (3)

8   attaches Exhibits 1-3, which depict a registration process that differs from what Mr. Stern

9   would have seen when he registered; and (4) includes Paragraphs 6-8, which lack

10  foundation.  Oppo. at 10:1-12:12.  Peloton replies that "Plaintiffs' evidentiary objections

11  fail for several reasons," including but not limited to the fact Mr. Feinberg provided a

12  supplemental declaration in support of Peloton's reply brief that addresses Plaintiff's

13  objections.  Reply at 8:11-14.

14       In the Supplemental Declaration, Mr. Feinberg (1) states that he is familiar with

15  Peloton's internal database, which it maintains in the ordinary course of business,

16  Supplemental Declaration of Daniel Feinberg, ECF No. 13-1 ("Feinberg Suppl. Decl.") at

17  2, ¶ 2; (2) describes the process that transpires when a customer registers and agrees to

18  the Terms of Service, including what account information related to that process is

19  maintained by Peloton, *id.*; (3) indicates he reviewed Mr. Stern's account information,

20  which shows that Mr. Stern registered for a Peloton account on August 25, 2019, and

21  again on November 29, 2019, and as part of that registration process, was required to

22  affirmatively agree to Peloton's Terms of Service regardless of whether he registered on

23  the website or mobile application, *id.* at 2, ¶¶ 3-4; and (4) when Mr. Stern created his

24  Peloton account in 2019, the registration process still required users to affirmatively click

25  a button acknowledging they agreed to the Terms of Service, *id.* at 3, ¶ 5.

26       Plaintiffs contend that Mr. Feinberg's Declaration cannot establish that Mr. Stern

27  accepted Peloton's Terms of Service because Mr. Feinberg does not state "what the

28  'account information'" that he looked at to determine Mr. Stern accepted Peloton's

Terms of Service "consists of, must less how the 'account information' was created, or whether and where it is stored." Oppo. at 10:1-6. They also argue that as a result, Mr. Feinberg's Declaration represents inadmissible hearsay. Hearsay is defined as a statement that (1) a declarant "does not make while testifying at the current trial or hearing" and (2) "a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). However, as noted, the Court applies a summary judgment type standard when ruling on a motion to compel arbitration. *Lopez*, 331 F. Supp. 3d at 1097. "[A]t summary judgment[,] a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). Here, Mr. Feinberg's Declaration is based on his personal knowledge and perceptions, and if offered in court, would otherwise be admissible. Further, Rule 803(6) of the Federal Rules of Evidence ("FRE") excludes from the rule against hearsay, records "of an act, event, condition, opinion, or diagnosis" where the following conditions are met:

> (1) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business . . . ; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) . . .; or (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Under Rule 902(11) of the FRE, a copy of business records meeting the aforementioned requirements, "as shown by a certification of the custodian or another qualified person" is self-authenticating. Here, Mr. Feinberg's initial declaration may not have established that (1) the record was made at or near the time of the event by or from information transmitted by someone with knowledge; (2) the record was made as a regular practice of that activity; or (3) any basis exists to believe the source of the information or the method

1  or circumstances of its preparation are trustworthy.  Oppo. at 10:27-11:4 (citing FED. R.

2  EVID. 803(6)).  His supplemental declaration establishes that Mr. Feinberg has personally

3  knowledge of Peloton's internal database, which is maintained in the course of regularly

4  conduct business.  Feinberg Suppl. Decl. at 2, ¶ 2.  However, it does not establish that the

5  record was made "at or near the time" of the registration.  *See id.* at 2-3, ¶¶ 2-5.

6  Nonetheless, the Court finds this information could be established at trial, and given Mr.

7  Feinberg has established personal knowledge, the hearsay objection is **OVERRULED**.

8      Next, Plaintiffs object that "Mr. Feinberg's Declaration makes clear that Defendant

9  is unable to determine how or where [Mr. Stern]'s purported account was even created—

10  *e.g.*, Defendant is not able to state if the account was created via Defendant's website or

11  mobile application, much less explain how [Mr. Stern] accepted the Terms of Service."

12  Oppo. at 11:9-14.  They also point out that Peloton "inexplicably offers screenshots of the

13  registration process from August 2021 to establish [Mr. Stern]'s acceptance of the Terms

14  of Service *two years earlier* in August 2019 (at a time when, Defendant concedes, the

15  process for accepting the Terms of Service differed <u>in undisclosed ways</u>."  *Id.* at 11:14-

16  18.    However,  these  problems  were  remedied  by  Mr.  Feinberg's  Supplemental

17  Declaration, which established that regardless of whether Mr. Stern created his account

18  on the website or mobile application, he still would have been required to "click a button

19  acknowledging that the user agrees to the Peloton Terms of Service."  Feinberg Suppl.

20  Decl. at 3, ¶ 5.  Thus, Plaintiffs' objection on this basis is also **OVERRULED**.

21      Third, Plaintiffs argue that Peloton's failure to proffer or otherwise detail the

22  "account information," which purportedly establishes that Mr. Stern accepted the Terms

23  of Service, violates the Best Evidence Rule.  Oppo. at 11:22-25.  Peloton also failed to

24  produce a true copy of the material cited, which is a precursor to introducing evidence of

25  information contained in the document.  *Id.* at 11:26-28 (citing FED. R. EVID. 1002, 1003,

26  and 1004).  However, "the best evidence rule is not applicable when a witness testifies

27  from personal knowledge of the matter, even though the same information is contained in

28  a writing."  *Backcountry v. United States Bia*, No. 20-CV-2343 JLS (DEB), 2021 U.S.

1   Dist. LEXIS 155344, at *14 (S.D. Cal. Aug. 6, 2021) (Sammartino, J.) (quoting *United*

2   *States v. Gonzales-Benitez*, 537 F.2d 1051, 1053 (9th Cir. 1976)) (internal quotations

3   omitted). Because Mr. Feinberg's declaration is based on personal knowledge, Plaintiffs'

4   Best Evidence Rule objection is also **OVERRULED**.

5       Finally, Plaintiffs argue Mr. Feinberg failed to lay a proper foundation for

6   Paragraphs 6-8 of the Declaration, which they argues is "riddled with speculation."

7   Oppo. at 12:1-2 (citing FED. R. EVID. 601, 602). They point out that Mr. Feinberg "has

8   disclosed nothing that suggests [he] has personal knowledge regarding [Mr. Stern]'s

9   purported acceptance of the Terms of Service." *Id.* at 12:4-6. However, Mr. Feinberg's

10  two declarations establish that (1) he has personal knowledge as to when Mr. Stern

11  registered for a Peloton account, *see* Feinberg Suppl. Decl. at 2-3, ¶¶ 3-4; (2) when users

12  undertake a registration, they must accept Peloton's Terms of Service; and (3) Peloton

13  maintains users' account information related to that process, including whether they

14  accepted the required legal agreements, *see id.* at 2, ¶ 2. Thus, Plaintiffs' objection that

15  Mr. Feinberg failed to lay a proper foundation is also **OVERRULED**.

16      Thus, Plaintiffs' Evidentiary Objections are **OVERRULED**.

17  **D.**   **Defendant's Motion to Dismiss, or in the Alternative, Stay the Case**

18      Peloton argues that "[g]iven the parties' Arbitration Agreement, the Court should

19  either dismiss or stay this action." Mot. at 18:9-10. It contends the Court can dismiss

20  this case in its entirety because the claims (1) should be referred to the arbitrator or (2)

21  are unripe. *Id.* at 18:10-12. Alternatively, Peloton asks the Court to stay the claims so

22  the arbitrator may decide arbitrability. *Id.* at 18:12-13. Plaintiffs oppose the stay by

23  asking that "in the unlikely event this Honorable Court is inclined to grant Defendant's

24  Motion in part, the remaining Plaintiffs should be permitted to proceed with their claims

25  concurrently." Oppo. at 13:15-17. Plaintiff contends that Peloton has not carried its

26  burden of showing that the issue to be litigated is within the scope of the issue to be

27  decided in arbitration. *Id.* at 13:17-23.

28      "[N]otwithstanding the language of § 3, a district court may either stay the action

-34-

1   or dismiss it outright when . . . the court determines that all of the claims raised in the
2   action are subject to arbitration." *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d
3   1072, 1073-74 (9th Cir. 2014); *see also Sparling v. Hoffman Constr. Co.*, 864 F.2d 635,
4   638, 641 (9th Cir. 1988) (affirming the district court's dismissal of one the plaintiff's
5   claims because the parties agreed to submit those claims to arbitration, and no
6   nonarbitrable claims remained in the case); *Gadomski*, 281 F. Supp. 3d at 1020-21
7   (holding that "because both claims are to be arbitrated, the Court dismisses Plaintiff's
8   claims in favor of arbitration"). The Ninth Circuit has "urge[d] district courts . . . to be as
9   clear as possible about whether they truly intend to dismiss an action or mean to grant a
10  stay pursuant to 9 U.S.C. § 3, which supplies that power" because "a dismissal renders an
11  order appealable under § 16(a)(3), while the granting of a stay is an unappealable
12  interlocutory order under 16(b)." *Bushley v. Credit Suisse First Bos.*, 360 F.3d 1149,
13  1153 n.1 (9th Cir. 2004) (noting that "[u]nnecessary delay of the arbitral process through
14  appellate review is disfavored"). Defendant contends that *Bushley* stands for the
15  proposition that "[t]he Ninth Circuit has explained that a stay is preferable to a dismissal,
16  because the latter is immediately appealable and could therefore undermine the efficiency
17  arbitration is meant to provide." Reply at 24:5-9 (citing *Bushley*, 360 F.3d at 1153 n.1).
18  The Court disagrees with this characterization as it reads *Bushley* to reiterate that district
19  courts should ensure that they rule on a request to stay proceedings when ruling on a
20  motion to compel arbitration. *See, e.g., Bushley*, 360 F.3d at 1153 (pointing out that "the
21  district court did not rule upon the motion to stay the proceedings").

22          Plaintiffs oppose the stay by arguing that "by way of example only, if [Mr. Stern]'s
23  claims are compelled to arbitration, the remaining issues to be litigated as to S.S. and
24  [Mrs. Stern] will not be decided in the arbitration and, therefore, there is no need to stay
25  this litigation." Oppo. at 13:24-26. The Court agrees with Plaintiffs that the question of
26  whether Peloton owed a duty of care to or made misrepresentations to Mr. Stern, are
27  separate and apart from the question of whether Peloton owed S.S. or Mrs. Stern a duty
28  of care. *Id.* at 13:26-14:1. Thus, whether or not an arbitrator determines that Mr. Stern is

-35-

entitled to recovery has no impact on Mrs. Stern and S.S., and Peloton's request for a stay as to Mrs. Stern and S.S. is **DENIED**.

## V.      CONCLUSION

For the above reasons, the Court rules as follows:

1.      Peloton's Motion to Compel Arbitration is **DENIED** as to Mrs. Stern and S.S. but **GRANTED** as to Mr. Stern only.

2.      Peloton's Motion to Dismiss is **DENIED** *WITHOUT PREJUDICE*.

3.      Peloton's Motion to Stay is **DENIED** as to Mrs. Stern and S.S. but **GRANTED** as to Mr. Stern as follows:

a.      Within ten (10) days of this order, Plaintiffs shall either (1) voluntarily dismiss Mr. Stern's claims pursuant to Rule 41(a)(1)(A) of the Federal Rules of Civil Procedure, leaving no remaining claims in this controversy subject to arbitration or (2) submit the issue of whether Mr. Stern's claims fall within the scope of the Arbitration Provision to arbitration.

b.      If Plaintiffs elect to dismiss Mr. Stern's claims within the deadline provided above, no stay will apply to this case.

c.      If Plaintiffs choose to arbitrate Mr. Stern's case, then, the case shall be stayed as to Mr. Stern only until the earlier of either (1) the arbitrator's decision as to whether Mr. Stern's claims fall within the scope of the Arbitration Provision or (2) sixty (60) days from the date of this order, at which time the Parties must provide a status report to the Court as to the progress of the arbitration.

4.      Plaintiff's Evidentiary Objections are **OVERRULED**.

5.      Peloton must file an answer within ten (10) days of this order as to the claims of S.S. and Mrs. Stern.

**IT IS SO ORDERED.**

DATED:      October 6, 2021

_____

HON. ROGER T. BENITEZ
United States District Judge